UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1) ADMERLE HALL-HOSKINS, D.O, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 4:20-cv-00329-CVE-JFJ |
| 1) CATC MEDSTAFF, P.C., 2) CAREATC, INC. | § § § § | |
| Defendants. | § | **JURY TRIAL DEMANDED** |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Admerle Hall-Hoskins, D.O. ("Plaintiff"), complaining of Defendants CATC Medstaff, P.C. and CareATC, Inc. ("Defendants"), and for causes of action would respectfully show the Court as follows:

### I. INTRODUCTION

1.01  This is an action for breaches of two employment agreements with Defendants for specified terms. Defendants breached each of these agreements. More importantly, Defendants breached the implied duty of good faith and fair dealing through their conduct (a) in entering into each of the agreements with Plaintiff, (b) during Plaintiff's employment under each of the agreements, (c) in terminating each of the agreements with Plaintiff, and (d) otherwise breaking promises made during each of the agreements with Plaintiff. Plaintiff seeks damages, attorney's fees and costs.

### II. PARTIES

2.01  Plaintiff is a resident of Denton County, Texas. She is a citizen of the United States.

2.02    Defendant CATC Medstaff, P.C. ("CATC") is an Oklahoma professional corporation with its principle place of business located at 4500 S. 129th E Avenue, Suite 191, Tulsa, Oklahoma 74134-5891. It may be served by delivering a copy of this Complaint and a summons to its registered agent for service of process, The Corporation Company, 1833 South Morgan Road, Oklahoma City, Oklahoma 73128.

2.03    Defendant Care ATC, Inc. ("CareATC") is an Oklahoma corporation with its principal place of business located at 4500 S. 129th E Avenue, Suite 191, Tulsa, Oklahoma 74134-5891. It may be served by delivering a copy of this Complaint and a summons to its registered agent for service of process, The Corporation Company, 1833 South Morgan Road, Oklahoma City, Oklahoma 73128.

### III. JURISDICTION

3.01    Pursuant to 28 U.S.C. § 1332, this Court has original jurisdiction of this action. The parties are citizens of different states and the amount in controversy exceeds $75,000.

3.02    Pursuant to 28 U.S.C. § 1391, venue for this action lies with this Court. The principle office of each Defendant lies within the boundaries of this District.

### IV. CONDITIONS PRECEDENT

4.01    All conditions precedent to filing suit have been fulfilled.

4.02    On Nov. 26, 2018, Plaintiff entered into an Agreement with Defendants providing: "Any controversy or claim arising out of or relating to this Agreement (including, without limitation, … any disputes with respect to Employee's employment by Employer or the termination of such employment)…" The Agreement is silent as to how the cost of arbitration is to be allocated between Plaintiff and Defendants.

4.03   Prior to this suit, on March 9, 2020, Plaintiff sent a written demand for arbitration to Defendants' counsel in accordance with the Nov. 26, 2018 Agreement.

4.04   On March 24, 2020, counsel for Defendants responded in writing to Plaintiff's arbitration demand. Defendants agreed to arbitration only "on the express condition that Dr. Hall-Hoskins shares evenly in the costs and fees of arbitration."

4.05   On May 11, 2020, a claim (Case No. 01-20-0005-2024) was filed by Plaintiff with the American Arbitration Association ("AAA") under its Employment Arbitration Rules & Mediation Procedures.

4.06   On May 26, 2020, Plaintiff signed a written authorization for the AAA to arbitrate her claim. Defendants never responded to, or signed, a written authorization for the AAA to arbitrate Plaintiff's claim. As a result, the AAA dismissed Plaintiff's claim. Accordingly, the parties have been unable to agree to arbitration as the appropriate forum for the claims set forth in this *Original Complaint*.

## V. BACKGROUND FACTS

### A. First Physician Employment Agreement

5.01   On Sept. 27, 2018, Plaintiff entered into a Physician Employment Agreement ("First Agreement") with Defendants with an "Effective Date" of Sept. 27, 2018.

#### 1. Place of Work

5.02   Under the First Agreement, Plaintiff was to provide services to employees of the City of Irving. Plaintiff was chosen to provide these services not only by Defendants but also from a choice of several physicians by a committee of the City of Irving Department leaders.

5.03   Section 1.01 of the First Agreement says Plaintiff need perform services only at the place of business specified in the First Agreement, which is the "City of Irving" employee clinic.

2. Term

5.04     Section 3.01 of the First Agreement provides: "This Agreement shall be effective for a term of three (3) years commencing on the Effective Date, and subject to earlier termination in accordance with this Agreement."

3. Compensation

5.05     Exhibit A to the First Agreement provides for annual compensation of $228,000.

4. Credentials

5.06     Section 1.01(c) of the Agreement states:

"Physician shall maintain Appropriate Credentials. The term "Appropriate Credentials" shall mean that Physician (1) is duly licensed to practice medicine in the state of licensure without limitation or restriction, (2) in good standing with their profession and state professional association, (3) has never had their license to practice medicine in any state restricted, revoked or suspended; (4) has never been convicted of a felony, (5) has never had an involuntary restriction placed on their DEA registration; (6) had never had an adverse action pertaining to medical staff membership or clinical privileges at a health care facility; (7) has never made a report to the National Practitioner Data Bank; (8) has never been sanctioned by Medicare and Medicaid; and (9) is otherwise qualified to provide the services pursuant to this Agreement."

No other "Appropriate Credentials" are required by the First Agreement.

5.07     Section 4.07 of the First Agreement also says:

"It is understood and agreed to by Physician that either board certification or eligibility for board certification is a prerequisite to employment by CATC. Further, the provider remaining board certified or board eligible during the term of this Agreement is required for continued employment."

5.08     At all times during the term of the First Agreement, Plaintiff has had the Appropriate Credentials and board certification required by the First Agreement.

5.09     At the time of the execution of the First Agreement, Plaintiff did not have Baylor credentials. Defendants were fully aware at that time Plaintiff did not have such credentials.

5.10     At the time of the execution of the First Agreement, Defendants never informed Plaintiff that her lack of Baylor credentials would be an issue with her continued employment with

Defendants. Upon information and belief, Defendants were aware at the time that her lack of Baylor credentials would be an issue with her continued employment with Defendants yet withheld this information from Plaintiff.

5.11   Since Plaintiff was to perform her services under the First Agreement at Irving CareATC, she had no reason to believe her lack of Baylor credentials would be an issue with her continued employment with Defendants.

### 5. Privileges

5.12   Before the execution of the First Agreement Defendants provided Plaintiff with a written Declaration of Privileges. This Declaration granted Plaintiff the following privileges:

a. "Perform History & Physical examinations, Medical Screenings, etc."

b. "Initiate consultations and monitor scheduling of patients for special tests."

c. "Perform and interpret diagnostic procedures."

d. "Order and administer local anesthesia, injections, immunizations, IV fluids."

e. "Prescribe and dispense medications."

f. "Suture minor wounds and lacerations."

g. "Cleanse and dress wounds."

h. "Remove Sutures."

i. "Apply slints."

j. "Diagnose and treatment of mental issues including depression, anxiety, sleep disorders, ADD, etc."

k. "Provide education and counseling on health habits, i.e., exercise, tobacco, alcohol, weight management, supportive counseling, etc."

l. "Perform Incision & Drainage, debridements, etc."

m. "Perform skin biopsy, punch excision, etc."

  n.  "Perform joint aspirations and injections."

  o.  "Perform minor surgical procedures, such as nail removal, foreign body removal, etc."

  p.  "Perform well woman breast exams, such as pelvic exams, breast exams, etc."

  q.  "Perform routine newborn care."

  r.  "perform routine pediatric care."

  s.  "Supervision of Allied Health Practitioner."

5.13 At no time during the First Agreement did Plaintiff exceed her privileges for Defendants.

5.14 At no time during the First Agreement did it become necessary for Plaintiff to exercise privileges or perform services at any Baylor location. Indeed, Defendants' clinics are outpatient only and no physicians do hospital admitting. Accordingly, hospital credentials are unnecessary for any physicians employed by Defendants.

### 6. Duties

5.15 At all material times, Plaintiff satisfactorily performed her duties under the First Agreement.

5.16 At all material times, Plaintiff devoted her "best attention to performing services faithfully pursuant to [the First] Agreement", and "faithfully and diligently [carried] out such duties … and … such responsibilities as are customary among persons employed in similar capacities", as provided by Section 1.01 of the First Agreement.

5.17 At all materials times, Plaintiff "faithfully and diligently [complied] with all reasonable and lawful directives of" Defendants, as provided by Section 1.01 of the First Agreement.

5.18    At all material times, Plaintiff satisfactorily performed her duties pursuant to "appropriate national practice parameters established by Physician's medical specialty board and benchmarks established by" Defendants, as provided in Section 1.01(b) of the First Agreement.

5.19    At all material times, Plaintiff maintained and promoted the core values set forth in Section 1.05 of the First Agreement, to wit: "Committed, Accountable, Respectful, Empathetic, Anticipatory, Trusting and Celebratory."

7. Termination

5.20    Section 3.01(d) of the First Agreement sets forth one manner by which the First Agreement can be terminated:

> ""CATC or Physician gives written notice to the other party of the termination of this Agreement without cause in which case such termination shall be effective on the later of the termination date specified in the notice or the ninetieth (90th) day after such notice is given."

5.19    As to written notice, Section 4.01 of the First Agreement provides:

> "All notices and other communications permitted or required pursuant to this Agreement shall be in writing, addressed to the party at the address set forth at the end of this Agreement or to such other address as the party may designate from time to time in accordance with this section 4.01. All notices and other communications shall be (a) mailed by certified mail, return receipt requested (b) personally delivered or (c) sent electronically with a receipt confirmation.  Notices mailed pursuant to this Sections 4.01 shall be deemed given as of three days after the date of mailing and notices personally delivered or sent by electronically shall be deemed given at time of receipt."

5.21    Section 3.01(d) of the First Agreement sets forth another manner by which the First Agreement can be terminated. This Section provides that Defendants "shall have the right to termination Physician's employment at any time for any of the following reasons (each of which is referred to as "Cause") by giving Physician written notice on or before the effective date of termination":

> 1)    <u>Disqualification</u>. Physician ceases to be licensed to practice medicine in the state of employment, or any medical license, permit, registration or other license or

certification of Physician is suspended, restricted, revoked or canceled, or Physician is otherwise subject to professional discipline or censure, or any representation made by Physician herein is at any time false or inaccurate;

2) <u>Quality of Service</u>. CATC determines in good faith that Physician is negligent in the performance of health care services;

3) <u>Bad Acts</u>. Physician commits or permits any act or conduct which, in the good faith determination of CATC: (i) endangers the health, life or safety or any patient, co-worker or other person; (ii) may place CATC into public ill repute or in non-compliance with any federal, state or other law, rule or regulation; (iii) adversely affects, or is likely to adversely affect, CATC's relationship with any Client or other health care facility or patient, or with any third party contracting with CATC; or (iv) constitutes professional misconduct, or fraudulent, oppressive or criminal behavior, or alcoholism or substance abuse;

4) <u>Failure to Qualify for Insurance Coverage</u>. Physician fails for any reason to qualify, at reasonable premium rates, for the professional liability insurance coverage required by this Agreement, as offered through commercial insurance;

5) <u>Failure to Comply With CATC Policies</u>. Physician fails to substantially comply with any of the certificate of formation, bylaws, policies, procedures, standards, requirements, compliance plans, or other rules and regulations of CATC as may be established from time to time by CATC;

6) <u>Breach</u>. Physician breaches any term or provision of this Agreement, and the breach, if curable and not otherwise cause for termination pursuant to this Article, is not cured to the reasonable satisfaction of CATC within thirty (30) days after written notice of the breach is given to Physician.

### 8. Choice of Law

5.22    Section 4.04 of the First Agreement states: "This Agreement shall be governed by, and interpreted in accordance with, the internal laws of the State of Oklahoma, without giving effect to its conflict of laws provisions."

### B. First Termination of Employment

#### 1. Defendants Inform Others of Termination Before Notifying Plaintiff

5.23    Defendants informed Plaintiff's patients of her impending termination of employment before they informed Plaintiff. Beginning in April 2019, Plaintiff was informed by patients they had been informed she would no longer be employed by the City of Irving employee

Clinic after August 15, 2019. Plaintiff was humiliated and surprised to learn this information from her patients without a word from Defendants.

5.24   Defendants informed the City of Irving of Plaintiff's impending termination of employment before they informed Plaintiff. In April 2019, the City of Irving was informed Plaintiff would be terminated because she did not qualify for privileges at Baylor. Plaintiff learned this information from the City of Irving.

5.25   Beginning in April 2019, Defendants was recruiting Plaintiff's replacement at the City of Irving employee clinic before Plaintiff was notified of her termination.

### 2. May 17, 2019 Telephone Call

5.26   Defendants first informed Plaintiff of her impending termination from the City of Irving employee clinic during a telephone conversation on May 17, 2019.

5.27   During the May 17th telephone conversation, Defendants informed Plaintiff she would be informed of available positions in the Dallas/Fort Worth area.

5.28   Plaintiff was provided no written documentation memorializing the decision at the time of the May 17th telephone conversation.

### 3. May 29, 2019 E-Mail

5.29   On May 29, 2019, Plaintiff received via e-mail a written letter entitled "Notice of Termination of Employment." The letter was backdate to dated "May 17, 2019", rather than the date it was actually forwarded to Plaintiff.

5.30   The letter attached to the May 29th e-mail notified Plaintiff her employment would be terminated "effective end of business Friday, August 16, 2019." August 16th was only 79 days after the May 29th e-mail.

5.31    The letter attached to the May 29th e-mail stated Plaintiff was being terminated for not meeting "the credentialing requirements of your position." This statement was (a) false as Plaintiff had met all of the credentialing requirements of her position which she had been performing since September 2019, and (b) not a "Cause" for termination under the First Agreement.

### 4. City of Irving Offers To Help

5.32    During conversations with the City of Irving after learning of her termination, Plaintiff also learned the City of Irving wanted her to remain employed at the City of Irving Clinic. The City of Irving even offered to speak to Baylor on Plaintiff's behalf.

5.33    True to its offer, the City of Irving provided Plaintiff, on July 16, 2019, a written recommendation. The written recommendation stated:

> "Dr. Hall-Hoskins opened up our City of Irving employee clinic on December 3, 2018. She was selected by a committee comprised of employee representatives, staff from the City's human resources department and … the Human Resources Director. Dr. Hall-Hoskins was selected because of her passion for the work she does, genuine concern for her patients, her comprehensive approach to medicine and her previous employment history.
>
> During the time that Dr. Hall-Hoskins has been the medical provider at our city clinic we have found her to be everything that we thought in the initial interview and more. Dr. Hall-Hoskins is passionate about the work she does for us. She sincerely cares about our employees and takes whatever time is necessary to ensure that their questions are answered. In fact, we receive numerous compliments from our employees on the quality of care that Dr. Hall-Hoskins provides, Our employees are especially appreciative of the fact that she generally cares about them and doesn't rush them out the door with unanswered questions."

5.34    Plaintiff informed Defendants of the offer made by the City of Irving. Nevertheless, Defendants declined to accept the City of Irving Employee Healthcare Committee offer to meet with Baylor Hospital on Plaintiff's behalf and support.

### C. Plaintiff Threatens Legal Action

5.35    An available full-time physician position opened at Defendants' clinic in Fort Worth, Texas. Plaintiff found an advertisement for the position on Indeed.com on Sept. 4, 2019, less than three weeks after her Aug. 16, 2019 termination.

5.36    Contrary to the promise made to Plaintiff, Defendants never contacted her about this available full-time physician position in Fort Worth.

5.37    Had Plaintiff been timely offered the full-time physician position in Fort Worth, she would have been off from work for less than one month, if at all.

5.38    On Sept. 6, 2019, Plaintiff sent a demand letter to Defendants through legal counsel.

### D. Second Physician Employment Agreement

5.39    Plaintiff was made an unconditional offer to return to work for Defendants at the clinic in Fort Worth, Texas. On Nov. 3, 2018, Plaintiff entered into a Physician Employment Agreement ("Second Agreement") with Defendants with an "Effective Date" of Nov. 11, 2019.

#### 1. Term

5.40    Section 3.01 of the Second Agreement provides: "This Agreement shall be effective for a term of three (3) years commencing on the Effective Date, and subject to earlier termination in accordance with this Agreement."

#### 2. Compensation

5.41    Exhibit A to the Second Agreement provides for annual compensation of $228,000.

#### 3. Duties

5.42    At all material times through Feb. 17, 2020, Plaintiff satisfactorily performed her duties under the Second Agreement.

5.43    At all material times through Feb. 17, 2020, Plaintiff devoted her "best attention to performing services faithfully pursuant to [the Second] Agreement", and "faithfully and diligently

[carried] out such duties … and … such responsibilities as are customary among persons employed in similar capacities", as provided by Section 1.01 of the Second Agreement.

5.44   At all materials times through Feb. 17, 2020, Plaintiff "faithfully and diligently [complied] with all reasonable and lawful directives of" Defendants, as provided by Section 1.01 of the Second Agreement.

5.45   At all material times through Feb. 17, 2020, Plaintiff satisfactorily performed her duties pursuant to "appropriate national practice parameters established by Physician's medical specialty board and benchmarks established by" Defendants, as provided in Section 1.01(b) of the First Agreement.

5.46   At all material times through Feb. 17, 2020, Plaintiff maintained and promoted the core values set forth in Section 1.05 of the First Agreement, to wit: "Committed, Accountable, Respectful, Empathetic, Anticipatory, Trusting and Celebratory."

### 4. Disability Leave

5.47   Section 3.01(c) of the Second Agreement provides for disability leave:

> "Disability. CATC may place a provider on unpaid leave of absence immediately upon notice to Physician, in the event that Physician become disabled during the Agreement through any illness, injury, accident or condition of either a physical or psychological nature and, as a result, is unable to perform substantially all of Physician's duties for ninety (90) days during any consecutive three-hundred sixty-five (365) days during the Agreement. Providers who are eligible for CATC benefits will remain a CATC employee, and will continue to be benefits eligible, up to 180 days after disability begins, or until short term disability benefits have exhausted."

### 5. Termination

5.48   Section 3.01(d) of the Second Agreement sets forth one manner by which the Second Agreement can be terminated:

> ""CATC or Physician gives written notice to the other party of the termination of this Agreement without cause in which case such termination shall be effective on the later of

the termination date specified in the notice or the ninetieth (90th) day after such notice is given."

5.49   As to written notice, Section 4.01 of the Second Agreement provides:

"All notices and other communications permitted or required pursuant to this Agreement shall be in writing, addressed to the party at the address set forth at the end of this Agreement or to such other address as the party may designate from time to time in accordance with this section 4.01. All notices and other communications shall be (a) mailed by certified mail, return receipt requested (b) personally delivered or (c) sent electronically with a receipt confirmation.  Notices mailed pursuant to this Sections 4.01 shall be deemed given as of three days after the date of mailing and notices personally delivered or sent by electronically shall be deemed given at time of receipt."

5.50   Section 3.01(d) of the Second Agreement sets forth another manner by which the Second Agreement can be terminated. This Section provides that Defendants "shall have the right to termination Physician's employment at any time for any of the following reasons (each of which is referred to as "Cause") by giving Physician written notice on or before the effective date of termination":

1) <u>Disqualification</u>. Physician ceases to be licensed to practice medicine in the state of employment, or any medical license, permit, registration or other license or certification of Physician is suspended, restricted, revoked or canceled, or Physician is otherwise subject to professional discipline or censure, or any representation made by Physician herein is at any time false or inaccurate;

2) <u>Quality of Service</u>. CATC determines in good faith that Physician is negligent in the performance of health care services;

3) <u>Bad Acts</u>. Physician commits or permits any act or conduct which, in the good faith determination of CATC: (i) endangers the health, life or safety or any patient, co-worker or other person; (ii) may place CATC into public ill repute or in non-compliance with any federal, state or other law, rule or regulation; (iii) adversely affects, or is likely to adversely affect, CATC's relationship with any Client or other health care facility or patient, or with any third party contracting with CATC; or (iv) constitutes professional misconduct, or fraudulent, oppressive or criminal behavior, or alcoholism or substance abuse;

4) <u>Failure to Qualify for Insurance Coverage</u>. Physician fails for any reason to qualify, at reasonable premium rates, for the professional liability insurance coverage required by this Agreement, as offered through commercial insurance;

5) <u>Failure to Comply With CATC Policies</u>. Physician fails to substantially comply with any of the certificate of formation, bylaws, policies, procedures, standards, requirements, compliance plans, or other rules and regulations of CATC as may be established from time to time by CATC;

6) <u>Breach</u>. Physician breaches any term or provision of this Agreement, and the breach, if curable and not otherwise cause for termination pursuant to this Article, is not cured to the reasonable satisfaction of CATC within thirty (30) days after written notice of the breach is given to Physician.

### 6. Choice of Law

5.51   Section 4.04 of the Second Agreement states: "This Agreement shall be governed by, and interpreted in accordance with, the internal laws of the State of Oklahoma, without giving effect to its conflict of laws provisions."

### E. Second Termination of Employment

#### 1. Plaintiff's Treatment by Defendants

5.52   After Nov. 11, 2019, Plaintiff was subjected to onerous terms and conditions of employment.

5.53   After Nov. 11, 2019, Plaintiff inquired, through legal counsel, about pay due and owing to her for the interim period between Aug. 16, 2019 and Nov. 11, 2019. Plaintiff was advised not to pursue the matter further, the implied threat being she would lose her job if she did so.

#### 2. Plaintiff Takes Disability Leave

5.54   Plaintiff was required to take disability leave for medical reasons detailed in a Feb. 17, 2020 letter from her doctor. Despite written correspondence from her physician, Plaintiff was subsequently interrogated by Defendants regarding her medical condition.

5.55   On March 9, 2020, while she was on disability leave, Plaintiff sent Defendants a demand for arbitration as to the First Agreement and Second Agreement.

5.56   A second letter from Plaintiff's doctor extended her disability leave to April 27, 2020.

5.57   Despite two letters from her doctor detailing medical reasons for disability leave, Defendants never placed Plaintiff on disability leave in accordance with Section 3.01(c) of the Second Agreement.

3. <u>March 24, 2019 Letter</u>

5.58   On March 24, 2020, Plaintiff was still on disability leave.

5.59.   On March 24, 2020, Plaintiff was notified by Defendants through legal counsel that her employment with Defendants was terminated effectively immediately pursuant to Sections 3.01(f)(3), (5) and (6) of the Second Agreement.

### VI. COUNT ONE: BREACH OF FIRST AGREEMENT

6.1   Plaintiff incorporates, and realleges, in full, paragraphs 1.1 through 5.59 of this Original Complaint.

6.2   The First Agreement was an enforceable contract under Oklahoma law.

6.3   At all material times during the period from Sept. 26, 2018 through Aug. 16, 2019, Plaintiff performed under the First Agreement.

6.4   Plaintiff was not an at-will employee of Defendants. Rather, she was employed by Defendants under the First Agreement for a specific term of three years. Accordingly, under Oklahoma law, the First Agreement included an implied covenant of good faith and fair dealing.

6.5   Defendants breached the First Agreement, and its implied covenant of good faith and fair dealing under the First Agreement, by engaging in the following conduct:

(a)   Entering into the First Agreement with Plaintiff while knowing, but not disclosing to Plaintiff, that her lack of Baylor credentials would be an issue with her continued employment;

(b)   Not making a good faith effort to resolve the issue with Plaintiff's lack of Baylor credentials short of her termination, including rejecting the offer of a solution by the City of Irving;

(c) Secretly planning Plaintiff's termination, and notifying others of her impending termination, before notifying her of her impending termination thereby humiliating her with patients and the City of Irving;

(d) Providing false reasons for Plaintiff's termination of employment which did not meet the definition of "Cause" under the First Agreement;

(e) Fraudulently backdating Plaintiff's written notice of termination to May 17, 2019, thereby not providing her ninety (90) days written notice of termination in accordance with Section 3.01(d) of the First Agreement;

(f) Not compensating Plaintiff for the eleven (11) day shortfall from the date of written notice until her termination on Aug. 16, 2019;

(g) Terminating Plaintiff's employment on August 16, 2019 under the circumstances detailed above; and

(h) Breaching Defendants' promise to move Plaintiff to an available full-time physician position despite the availability of such a position within one month of her termination.

6.6   As a direct and proximate result of the breach by Defendants of the First Agreement, and its implied covenant of good faith and fair dealing under the First Agreement, Plaintiff has been damaged by the loss of compensation under the First Agreement through September 2021, less any earnings under the Second Agreement.

6.7   As a direct and proximate result of the breach by Defendants of the First Agreement, and its implied covenant of good faith and fair dealing under the First Agreement, Plaintiff has been required to retain the law firm of Seltzer, Chadwick, Soefje & Ladik, PLLC to prosecute this lawsuit. Accordingly, Plaintiff has incurred attorney's fees which are reimburseable under Oklahoma law.

### VII. COUNT TWO: BREACH OF SECOND AGREEMENT

7.1   Plaintiff incorporates, and realleges, in full, paragraphs 1.1 through 6.7 of this Original Complaint.

7.2   The Second Agreement was an enforceable contract under Oklahoma law.

7.3     At all material times during the period from Nov. 11, 2018 through February 17, 2020, Plaintiff performed under the Second Agreement.

7.4     Plaintiff was not an at-will employee of Defendants. Rather, she was employed by Defendants under the Second Agreement for a specific term of three years. Accordingly, under Oklahoma law, the Second Agreement included an implied covenant of good faith and fair dealing.

7.5     Defendants breached the Second Agreement, and its implied covenant of good faith and fair dealing under the Second Agreement, by engaging in the following conduct:

(a)     Entering into the Second Agreement with Plaintiff while knowing, but not disclosing to Plaintiff, that her claims against Defendants under the First Agreement would be an issue with her continued employment;

(b)     Subjecting Plaintiff to terms and conditions of employment under which any reasonable physician would be compelled to resign;

(c)     Not placing Plaintiff on disability leave as provided by Section 3.01(c) of the Second Agreement, but instead questioning such leave despite medical documentation from Plaintiff's doctor;

(d)     Terminating Plaintiff on March 24, 2020 while she had only been on leave for a little more than a month;

(e)     Providing false reasons for Plaintiff's termination since disability is not a "Cause" for termination set forth in Sections 3.01(f)(3), (5) or (6) of the Second Agreement;

(f)     Not providing written notice of termination of termination in accordance with Section 3.01(d) of the Second Agreement; and

(g)     Terminating Plaintiff for making an arbitration demand while an employee of Defendants.

7.6     As a direct and proximate result of the breach by Defendants of the Second Agreement, and its implied covenant of good faith and fair dealing under the Second Agreement, Plaintiff has been damaged by the loss of compensation under the Second Agreement through November 2022.

7.7 As a direct and proximate result of the breach by Defendants of the Second Agreement, and its implied covenant of good faith and fair dealing under the Second Agreement, Plaintiff has been required to retain the law firm of Seltzer, Chadwick, Soefje & Ladik, PLLC to prosecute this lawsuit. Accordingly, Plaintiff has incurred attorney's fees which are reimburseable under Oklahoma law.

## VIII. JURY DEMAND

8.01 Plaintiff demands trial by jury for all claims herein.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendants be cited to appear and answer herein, and that upon final trial, Plaintiff have and recover the following relief against Defendants:

(1) Judgment for actual damages in the amount of past and future lost earnings and benefits;

(2) Prejudgment and post-judgment interest at the maximum legal rate;

(3) Attorney's fees;

(4) Expert fees;

(5) All costs of court; and

(6) Such other and further relief to which Plaintiff may be justly entitled.

Dated: July 8, 2020	Respectfully Submitted,

SELTZER, CHADWICK, SOEFJE & LADIK, PLLC

/s/ *Teddy J. Abbott*
**Teddy J. Abbott**
Oklahoma Bar No. 14367
tabbott@realclearcounsel.com
1320 North Mill Street, Suite 222
Muskogee, OK 74401
(918) 360-0531 (telephone)
(972) 767-4246 (facsimile)

**Robert G. Chadwick, Jr.**
Texas Bar No. 04056075
rchadwick@realclearcounsel.com
5851 Legacy Circle, Suite 600
Plano, TX 75204
(469) 626-5180 (telephone)
(972) 767-4246 (facsimile)

*Attorneys for Plaintiff Admerle Hall-Hoskins*